Joseph W. Cotchett (SBN 36324)
Thomas E. Loeser (SBN 202724)
Gia Jung (SBN 340160)
**COTCHETT, PITRE & McCARTHY,**
**LLP**
840 Malcolm Road
Burlingame, CA 94010
T: (650) 687-6000
F: (650) 697-0577
jcotchett@cpmlegal.com
tloeser@yahoo.com
gjung@cpmlegal.com

*[Additional counsel on signature page]*

*Counsel for Plaintiffs*

*\*pro hac vice forthcoming*

Eduard Korsinsky\*
Mark Jensen\*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
T: (212) 363-7500
F: (212) 363-7171
ek@zlk.com
mjensen@zlk.com

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN BELTRAN, ALICIA PEREZ, and TERRANCE MOORE, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Steven Beltran, Alicia Perez, and Terrance Moore ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this class action Complaint against Defendant Meta Platforms, Inc. ("Meta"), Defendant Samasource Impact Sourcing, Inc. d/b/a "Sama" ("Sama") and Defendant Luxottica of America, Inc. ("Luxottica") (collectively, "Defendants") for the privacy violations alleged herein. Plaintiffs allege the following upon information and belief based upon the investigation of counsel and Plaintiffs' personal knowledge of facts relating to Plaintiffs' own actions.

## NATURE OF THE ACTION

1.  This case arises from Defendants' unfair and deceptive marketing and unlawful recording and data-collection practices related to the "Meta AI Glasses," a line of smart glasses marketed under the Ray-Ban and Oakley brands.

2.  Defendants market the Meta AI Glasses as products designed to protect user privacy and give consumers control over their personal data. Defendants repeatedly represented that the Meta AI Glasses were "designed for privacy," "controlled by you," and "built for your privacy."[1] These representations were false and misleading.

3.  In reality, when a user activates the Meta AI Glasses by physically pressing a button or speaking the wake phrase "Hey Meta," the device captures high-resolution video and audio and transmits that data through the user's smartphone to Meta's cloud servers and to Sama, a subcontractor operating data-annotation facilities in Nairobi, Kenya.[2]

4.  Once the user's private data and/or recordings are routed to Sama, thousands of human workers review, label, and analyze footage captured by Meta AI Glasses in order to train Meta's artificial intelligence systems. These workers view highly sensitive and private recordings captured inside users' homes and other private spaces. Reports from workers involved in this

---

[1] *Meta AI Glasses*, META, https://www.meta.com/ai-glasses/privacy/ (last visited Mar. 10, 2026).
[2] *She Came Out of the Bathroom Naked, Employee Says, SVENSKA DAGBLADET* (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything, (last visited Mar. 9, 2026).

data-annotation process describe reviewing footage of individuals in bedrooms, bathrooms, and other private environments.

5.    Consumers were never informed that private footage captured by the Meta AI Glasses would be viewed and analyzed by several human contractors overseas. Nor did consumers provide informed consent for the capture, storage, or review of their reportedly identifiable private video and audio recordings for the purpose of training Meta's artificial intelligence systems.

6.    Defendants' practices violated and continue to violate consumers' reasonable expectations of privacy and therefore constitute unlawful capture, transmission, and misuse of private communications and recordings. Defendants' conduct is also deceptive and unfair because Defendants marketed the Meta AI Glasses as privacy-protective while concealing material information about the true nature of its data-collection practices.

7.    Plaintiffs and the members of the proposed Class and Subclasses purchased the Meta AI Glasses in reliance on Defendants' privacy-focused marketing representations. Had Plaintiffs and the putative Class and Subclass members known that the Meta AI Glasses would capture and transmit private footage for review by human contractors and for AI training purposes, they would not have purchased the Meta AI Glasses or would have paid substantially less for them. Defendants' conduct caused Plaintiff and those similarly situated to suffer economic injury, invasion of privacy, and loss of control over their personal data.

8.    Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiffs seek relief in this action individually and on behalf of a putative Class and Subclasses of similarly situated individuals for Defendants' violations of the federal Wiretap Act (as amended by the Electronic Communications Privacy Act) (collectively referred to herein as the "ECPA"), 18 U.S.C. § 2510, et seq.; California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770, et seq., California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, et seq.; California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, New York's Deceptive Acts and

Practices statute, N.Y. Gen. Bus. Law § 349; New York's False Advertising Law, N.Y. Gen. Bus. Law § 350; the Illinois Eavesdropping Act, 720 ILCS 5/14-1, et seq.; the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 et seq.; and for Defendants' common law invasion of privacy, negligence, and unjust enrichment.

## PARTIES

9.     Plaintiff Steven Beltran is, and at all relevant times has been, a citizen and resident of the State of California. In or about November 2025, Plaintiff Beltran purchased one pair of Meta AI Glasses for personal use. Plaintiff Beltran purchased the Meta AI Glasses after being exposed to Defendants' representations, both before and at the time of purchase, that the Meta AI Glasses were "designed for privacy," "controlled by you," "built for your privacy," and other substantially similar statements. Plaintiff Beltran reasonably understood Defendants' representations to mean that the Meta AI Glasses would protect his privacy and would not capture, transmit, disclose, or route his private identifiable audio, video, and related personal data to third parties or human reviewers without his informed consent. Plaintiff Beltran relied on these representations in deciding to purchase the Meta AI Glasses. Had Plaintiff Beltran known the true nature of Defendants' data collection, transmission, disclosure, and AI-training practices, he would not have purchased the Meta AI Glasses or would have paid substantially less for them. Plaintiff Beltran suffered injury in fact, including economic injury and invasion of privacy, as a direct and proximate result of Defendants' conduct.

10.     Plaintiff Alicia Perez is, and at all relevant times has been, a citizen and resident of the State of New York. In or about February 2025, Plaintiff Perez purchased one pair of Ray-Ban Meta AI Glasses through Amazon for approximately $299.00. Before and at the time of purchase, Plaintiff Perez was exposed to Defendants' representations that the Meta AI Glasses were privacy protective and gave users control over their personal data, including representations that the Meta AI Glasses were "designed for privacy," "controlled by you," "built for your privacy," and other substantially similar statements. Plaintiff Perez reasonably relied on Defendants' representations in deciding to purchase the product. Plaintiff Perez did not know,

and had no reason to know, that audio, video, and other sensitive information captured through the Meta AI Glasses could be transmitted to Meta's servers and reviewed, labeled, or otherwise processed by third-party contractors, including Sama, for artificial intelligence training and related purposes. Had Plaintiff Perez known the truth, she would not have purchased the product or would have paid substantially less for it. Plaintiff Perez suffered injury in fact, including economic injury and invasion of privacy, as a direct and proximate result of Defendants' conduct.

11.    Plaintiff Terrance Moore is and at all relevant times has been, a citizen and resident of the State of Illinois. Plaintiff Moore purchased one pair of Meta AI Glasses for personal use for more than $300.00. Prior to and at the time of purchase, Plaintiff Moore was exposed to Defendants' privacy-related marketing and representations, including that the Meta AI Glasses were "designed for privacy," "controlled by you," "built for your privacy," and substantially similar statements. Plaintiff Moore reasonably relied on these representations in deciding to purchase the product. Plaintiff Moore did not know, and could not reasonably have known, that private identifiable audio, video, and related user data captured through the Meta AI Glasses would allegedly be transmitted to Meta's systems and disclosed or made accessible to third-party contractors for review, labeling, and artificial intelligence training purposes. Had Plaintiff Moore known the true facts, he would not have purchased the Meta AI Glasses or would have paid less for them. Plaintiff Moore suffered injury in fact, including economic injury and invasion of privacy, as a direct and proximate result of Defendants' conduct.

12.    Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation, having its place of business at 1 Meta Way, Menlo Park, California 94025. Meta is a global technology company that operates widely used social media platforms, including Facebook, Instagram, Threads, and WhatsApp, and provides advertising and technology services to millions of businesses worldwide. Meta designs, manufactures (in partnership with EssilorLuxottica S.A.), distributes, markets, and sells the Meta AI Glasses. Meta also owns and operates the artificial intelligence software, cloud infrastructure, data processing systems, and contractual relationships through which user-captured footage from the Meta AI Glasses is transmitted to Meta's servers

and subsequently shared with its subcontractors. At all relevant times, Meta controlled the data pipeline associated with the Meta AI Glasses, including the on-device wake-word detection system, the companion smartphone application that facilitates connectivity, the cloud servers that receive and store captured footage, the annotation systems that route footage to human reviewers, and the AI models that utilize the result.

13.    Defendant Samasource Impact Sourcing, Inc., d/b/a Sama ("Sama"), is a Delaware corporation with its principal office located at 2017 Mission Street, Suite 301, San Francisco, California 94110. Sama operates data annotation facilities on Mombasa Road in Nairobi, Kenya, where it employs thousands of data annotators who manually review, label, and annotate video, audio, and image data for Meta and other technology companies. Sama workers assigned to the Meta AI Glasses project review footage captured by the Meta AI Glasses' cameras, including footage depicting users and individuals in their vicinity, to assist in training Meta's artificial intelligence models. Sama performs these annotation services under Meta's direction and control, carrying out tasks in accordance with Meta's specifications within a highly monitored work environment that restricts personal smartphones and utilizes workplace surveillance cameras.

14.    Defendant Luxottica of America, Inc. ("Luxottica") is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, Ohio 45040-8114. On information and belief, Luxottica, in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. The challenged representations and omissions concerning the products were prepared, authorized, ratified, and/or approved by Luxottica and its agents, and disseminated nationwide, including in California, to promote and sell the Meta AI Glasses to consumers.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the ECPA, 18 U.S.C. § 2510, *et seq.* This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5

million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the putative Class defined below is a citizen of a different state from one of the Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A). Defendants Meta and Sama have their principal places of business located in this District.

16.    This Court has personal jurisdiction over Defendants Meta and Sama because they maintain significant business presences and operations in this District, as well as maintain their principal places of business in this District.

17.    This Court has personal jurisdiction over Defendant Luxottica because Defendant Luxottica conducts substantial business and generates revenue both in the State of California and within this District and avails itself of the laws of California.

18.    Venue is proper in this Court because Defendants Meta and Sama's principal places of business are located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

19.    Further, as per L.R. 3-2(d), venue is proper in the San Francisco Division of this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Counties of San Francisco and San Mateo, as Defendants Meta and Sama's principal places of business are located in San Mateo County and San Francisco County, respectively.

## **FACTUAL ALLEGATIONS**

### I.    **Meta's AI Glasses and Their Underlying Technology**

20.    Defendants market and sell the Meta AI Glasses, a line of smart glasses that are sold under popular eyewear brands, including Ray-Ban and Oakley. Unlike traditional eyewear, the Meta AI Glasses contain embedded computing hardware and sensors, including cameras, microphones, speakers, and wireless connectivity components. These devices allow users to capture photographs, record videos, and interact with an artificial intelligence assistant integrated into the glasses.

CLASS ACTION COMPLAINT

21.    The Meta AI Glasses are powered by a Qualcomm Snapdragon AR1 Gen1 system-on-chip and feature integrated 12-megapixel cameras capable of capturing both still photographs and high-definition video, a multi-microphone array for voice capture and ambient audio recording, open-ear speakers, and Bluetooth and Wi-Fi connectivity for data transmission.

22.    The Meta AI Glasses operate in two recording modes: users can manually capture photos and video by pressing a physical button on the right temple of the frame, or users can activate Meta's AI assistant by speaking the wake phrase "Hey Meta," which triggers the Meta AI Glasses to begin recording audio and, in many modes, video, and to transmit that data to Meta's cloud servers for AI processing.

23.    Once activated, the Meta AI Glasses begin capturing audio and, depending on the mode, video from the user's surroundings. The Meta AI Glasses then transmit that data via the User's smartphone to Meta's cloud-based servers. Once transmitted to Meta's servers, Meta's artificial intelligence systems process the data to generate responses to user prompts, identify objects, translate text, or perform other AI-enabled functions.

24.    In other words, the Meta AI Glasses do not function as mere, ordinary eyewear but as a wearable device designed to capture audiovisual information about the physical world around the user. These capabilities allow Meta to gather large volumes of real-world video and audio recordings directly from users' daily lives. The recordings captured through the Meta AI Glasses provide data that can be used to train Meta's artificial intelligence systems.

25.    Meta's artificial intelligence models rely on vast quantities of labeled data in order to improve their ability to recognize objects, understand environments, and respond to user requests. Recordings captured through Meta AI Glasses contain video and audio from real-world environments and interactions.

26.    The Meta AI Glasses, therefore, function as a continuous pipeline through which Meta can collect audiovisual data from, *inter alia*, users' homes, workplaces, and private environments.

**II.    The Meta AI Glasses Intercept, Record, and Disclose Sensitive Identifiable Data Without Users' or Bystanders' Knowledge or Consent**

27.    When a user activates the AI feature on the Meta AI Glasses by either pressing the capture button or by issuing the voice command "Hey Meta," the Meta AI Glasses record audio and video information and send that information to the Meta AI application on the user's paired smartphone via Bluetooth or Wi-Fi, when available. The Meta AI application on the user's smartphone then performs preliminary processing, such as HDR rendering and image stabilization, before forwarding the data to Meta's cloud-based servers.

28.    Meta operates approximately twenty-four data center campuses worldwide, including at least eighteen operational facilities in the United States, as well as additional facilities within the European Union.

29.    Independent testing conducted by Swedish investigative journalists confirmed that during ordinary operation, the Meta AI Glasses consistently transmit data to Meta's servers.[3] Despite this data transmission, Defendants assured consumers that they would retain control over their personal information. For example, on a webpage dedicated to the Meta AI Glasses' privacy features, Defendants represent that "[y]ou're in control of your data and content" and that "clear, easy device and app settings" help users manage their information and determine what content they choose to share and when.[4]

30.    Defendants promote the Meta AI Glasses as "[b]uilt for your privacy and others' too," representing that they have implemented measures to protect not only the privacy of the user but also the privacy of individuals who may appear in photos or videos captured by the Meta AI Glasses. Defendants further represent that "When you use your glasses camera for AI features, we take steps to protect people's privacy, like removing key identifiable information."[5]

---

[3] *She Came Out of the Bathroom Naked, Employee Says, SVENSKA DAGBLADET* (Feb. 27, 2026) (last visited Mar. 9, 2026).

[4] *Ray Ban Meta Glasses Product Page*, META, https://www.meta.com/in/ai-glasses/privacy/ (last visited Mar. 10, 2026).

[5] *Id.*

31.     The Meta AI Glasses website also provides guidance to users on "[h]ow to wear your Ray-Ban Meta glasses responsibly," encouraging consumers to ensure that others feel "safe and comfortable" while the Meta AI Glasses are in use.[6] Through these representations, Defendants suggest that privacy and safety are important considerations and imply that the product can be used in a manner that adequately protects individuals' data.

32.     In reality, users of the Meta AI Glasses have limited control over when data is captured and transmitted by the Meta AI Glasses and/or what ultimately happens to the captured data. Meta explicitly changed its policies so consumers could no longer prevent their voice recordings from being stored, their most private moments from being captured, and ensured that certain AI and recording features were always on.[7] Moreover, the audio and visual data that is captured and transmitted by the Meta AI Glasses is not strictly limited to data related to the user, but also includes audio and visual data of the user's surroundings and interactions, including other persons who are not purchasers or users of the Meta AI Glasses.

33.     Contrary to Defendants' representations that such information is kept "safe," Meta transmits consumer-captured data and recordings from the Meta AI Glasses to third-party contractors, including a subcontractor known as Sama.[8] At Sama's facilities in Nairobi, Kenya, workers employed as data annotators review and label this sensitive user-captured footage and assign tags such as "cars," "lamps," and "people" to train Meta's artificial intelligence systems. Despite these practices, Meta does not disclose to consumers which cloud infrastructure processes the data, where the reviewers analyzing the footage are located, or that the individuals reviewing this material are contract data annotators employed by a commercial subcontractor thousands of miles away. Defendants also do not disclose to consumers that recordings captured through the

---

[6] *Id.*

[7] *Meta's Controversial Data Policy on Ray-Ban Smart Glasses Sparks Privacy Debate*, OPENTOOLS (May 1, 2025), https://opentools.ai/news/metas-controversial-data-policy-on-ray-ban-smart-glassessparks-privacy-debate#section0 (last visited Mar. 13, 2026).

[8] *She Came Out of the Bathroom Naked, Employee Says, SVENSKA DAGBLADET* (Feb. 27, 2026) (last visited Mar. 9, 2026).

Meta AI Glasses may be reviewed by human annotators as part of the artificial intelligence training process.

34.    Individuals employed as "data annotators" report being exposed to deeply personal and sensitive video footage captured by the Meta AI Glasses, including recordings of bathroom use, intimate encounters, and other private moments.[9] In one instance described by a reviewer, a user placed his Meta AI Glasses on a bedside table before leaving the room, after which his spouse unknowingly entered and changed clothes in front of the device.[10] The resulting footage was reportedly transmitted to remote annotation teams and reviewed for labeling to train Meta's artificial intelligence systems all without the woman's knowledge that the recording had been captured.

35.    Despite Defendants' representations that they would "take steps to protect people's privacy, like removing key identifiable information," and their reported policy of automatically blurring faces that appear in annotation data, human data annotators in Kenya have reported that these anonymization measures do not always function as intended. According to those reviewers, faces that should have been obscured were at times still visible in the footage provided for annotation.[11]

36.    The consumer data collected through the Meta AI Glasses is highly valuable to Meta. Continuous streams of new data are critical for developing and refining artificial intelligence systems, and as publicly available datasets become increasingly exhausted, proprietary sources of data can cost hundreds of millions of dollars to obtain.[12] Rather than relying solely on other sources of training data, Meta uses recordings captured through the Meta AI Glasses as data for training its artificial intelligence systems.

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] Hamidah Oderinwale and Anna Kazlauskas, *The Economics of AI Training Data: A Research Agenda, ARXIV* (Oct. 2025), https://arxiv.org/html/2510.24990 (last visited Mar. 9, 2026)

**III.    Meta Markets the Meta AI Glasses as Privacy-Protective**

37.    Because the Meta AI Glasses are capable of recording the world around the wearer, privacy concerns surrounding the product are obvious.

38.    In an attempt to assuage consumers' privacy concerns and encourage sales of the Meta AI Glasses, Defendants launched a concerted and extensive marketing campaign to emphasize the privacy and user control of the Meta AI Glasses.

39.    Marketing materials for the Meta AI Glasses repeatedly represented that the product was designed with privacy in mind. Defendants' representations were prominently displayed on Defendants' websites, promotional materials, and product pages, such as *Figure 1* below, where the Meta AI Glasses are advertised and promoted as "[d]esigned for privacy" and "[c]ontrolled by you."



*Figure 1 – Sample webpage used to demonstrate the Defendants' website*

40.    Defendants also represented that users would remain in control of their recordings and personal data. Users of the Meta AI Glasses were led to believe that the Meta AI Glasses' recording features operated primarily on-device and that their private recordings would remain under their control.

41.    Because purchasers and potential purchasers of the Meta AI Glasses, a device capable of recording video and audio data, would consider the product's privacy features to be a material factor informing their purchase, Defendants' misrepresentations were material to an objectively reasonable user's decision as to whether to purchase the Meta AI Glasses. These representations appeared in Defendants' product webpages, marketing materials, advertising campaigns, and retail product listings in the United States during the Class Period.

## IV.    Data Captured by Meta AI Glasses Is Routed to Sama's Annotation Pipeline

42.    The Meta AI Glasses operate through a multi-stage data architecture. The device contains an on-device microcontroller responsible for wake-word detection (triggered by the phrase "Hey Meta") and a Qualcomm Snapdragon AR1 Gen1 system-on-chip that enables audio and video capture. When the wake-word is detected or the capacitive capture button is pressed, the Meta AI Glasses begin recording and transmitting data. The captured audio and video data are transmitted via Bluetooth or Wi-Fi, when available, to the user's paired smartphone running the Meta AI application, which subsequently forwards them to Meta's cloud infrastructure. Once uploaded to Meta's servers, the user data enters a data annotation pipeline managed by Sama in Nairobi, Kenya. Sama workers review the footage and perform annotation tasks such as drawing bounding boxes around objects, assigning descriptive labels, verifying transcriptions, and conducting quality assurance. The resulting labeled data is then used to train and refine Meta's artificial intelligence models.

43.    A single "Hey Meta" activation in proximity of the Meta AI Glasses, whether in the user's bedroom, healthcare facility, or private office, can therefore initiate a chain of events that includes: (a) on-device audio and video capture; (b) wireless transmission of that data to the paired smartphone and onward to Meta's cloud servers; and (c) potential routing of the footage to a human annotator located in Kenya who reviews and labels the content. At no point in this process does the user receive real-time notice that the captured footage may be viewed by a human reviewer.

44.     The "Hey Meta" wake-word detection system is not perfectly precise, and Meta's internal policies define voice interactions broadly to include accidental activations and background audio occurring during interactions with the device.

45.     As a result of this imprecision, the Meta AI Glasses may begin recording in response to ambient speech or other unintended triggers, potentially capturing conversations or events the user did not intend to record, did not realize were being transmitted to Meta's servers, and did not meaningfully consent to either recording or transmittal.

46.     Meta's purported safeguard for this pipeline—an automatic face-blurring algorithm—does not reliably function. A former Meta employee acknowledged this failure: "The algorithms sometimes miss. Especially in difficult lighting conditions, certain faces and bodies become visible."[13]

47.     In investigating Meta's representations as to its purported safeguarding technology, the Swedish investigative journalists purchased their own pair of Meta AI Glasses and tested them, finding that: (a) the AI functions cannot operate solely through local, on-device processing—an internet connection is required; (b) network traffic analysis showed frequent and consistent data transmissions to Meta servers; and (c) the claim made by retail sales staff that "nothing is shared" with Meta and that "everything stays locally in the app" is demonstrably false.[14]

## V.     The Class Members Did Not Consent to Defendants' Conduct

48.     Meta's privacy disclosure framework for the Meta AI Glasses is divided across at least four separate documents: (1) the Supplemental Meta Platforms Technologies Privacy Policy; (2) the Meta AI Terms of Service; (3) the Meta Voice Controls Privacy Notice; and (4) the Supplemental Meta Platforms Technologies Terms of Service. Each document cross-references

---

[13] *She Came Out of the Bathroom Naked, Employee Says, SVENSKA DAGBLADET (Feb. 27, 2026) (last visited Mar. 9, 2026).*
[14] *Id.*

the others, resulting in multiple cross-referenced disclosures that no objectively reasonable consumer would read in full, let alone understand how their data is actually used by Defendants.

49.    The fragmentation and disorganization of Meta's privacy disclosure framework are by design. The critical disclosures about human review are contained in subsections nominally about voice recording storage, separated from the default-on disclosures about transcript storage. A user who reads only the primary privacy policy, which is lengthy and densely cross-referenced, would not learn that "trained reviewers" means underpaid data annotators employed by a commercial subcontractor in Nairobi, Kenya. Meta never defines "trained reviewers" in any of its policies.

50.    Meta does not explain or describe what is meant by "third parties," does not name Sama, does not identify Kenya as a processing location, and does not explain that human review of intimate video footage is being undertaken.

51.    All of this omitted information is and was highly relevant to Plaintiffs and the Class Members' purchases of the Meta AI Glasses.

52.    A consumer reading Meta's privacy policies would not understand that wearing the Meta AI Glasses in their home could result in footage of their spouse undressing, their child bathing, or their private conversations being transmitted to a warehouse in Kenya and viewed by strangers.

53.    On April 29, 2025, Meta restructured the default privacy settings for the Meta AI Glasses. Prior to that date, users could choose whether to enable Meta AI with camera functionality and could toggle voice recording storage on or off. After April 29, 2025, Meta enabled Meta AI with camera functionality by default on all Meta AI Glasses.[15] Meta simultaneously removed the option for users to opt out of voice recording storage entirely.

---

[15] Amanda Silberling, *If you own Ray-Ban Meta glasses, you should double-check your privacy settings,* TECHCRUNCH (Apr. 30, 2025 11:29 AM PDT) https://techcrunch.com/2025/04/30/if-you-own-ray-ban-meta-glasses-you-should-double-check-your-privacy-settings/ (last visited Mar. 11, 2026).

54.     After the April 2025 change, voice recordings and transcripts are stored by default and may be retained for up to one year. The only way users can avoid retention is to manually delete each recording from the app, which means a consumer would have to manually delete each recording after even an accidental 'waking' of the Meta AI Glasses. Unintended activations ("false wakes") are supposed to be deleted within 90 days, but even that reduced period means Meta retains recordings of conversations the user never intended to initiate.

55.     Meta communicated the April 2025 changes through a generic email to existing users that described the update as a routine privacy policy update. Meta did not use the words "opt-out removed," "setting discontinued," or "you must now manually delete" in this email notice. As such, any continued use does not constitute acceptance or consent, given that Meta's unilateral amendment lacks adequate notice of material changes.

56.     Indeed, for video recorded during live AI sessions, users have no way to know how long Meta retains video of their homes, their families, and their most private moments—or when, if ever, that data is deleted.

## STATUTE OF LIMITATIONS TOLLING

57.     Because Defendants' conduct aimed to conceal their unlawful practices, the statutes of limitations applicable to Plaintiffs' and the putative Class Members' claims should be tolled and the point of accrual measured from the date of discovery.

58.     When purchasing and using the Meta AI Glasses, Plaintiffs and the putative Class Members did not know, and could not have reasonably discovered, that Defendants were capturing, transmitting, and routing video and audio recordings from the Meta AI Glasses to Defendants' servers and third-party contractors for analysis and artificial intelligence training.

59.     Defendants designed the Meta AI Glasses and their associated software infrastructure in a manner that concealed the scope and nature of Defendants' data-collection practices from consumers.

60.     At no point during purchase, setup, or ordinary use of the Meta AI Glasses did Defendants clearly disclose that recordings captured through the Meta AI Glasses would be

transmitted to Defendants' servers and subsequently reviewed by human contractors or used to train Defendants' artificial intelligence models.

61.    The technical architecture of the Meta AI Glasses—including the transmission of recordings through the user's smartphone to Meta's cloud infrastructure and the routing of that data through internal processing systems—prevented ordinary consumers from detecting Defendants' practices.

62.    Defendants possessed exclusive knowledge of the data-collection pipeline governing the Meta AI Glasses, including the transmission, storage, and human review of captured recordings.

63.    Because this information was exclusively within Defendants' control and not publicly disclosed, Plaintiffs and the putative Class Members could not reasonably discover Defendants' conduct through ordinary diligence.

64.    Defendants further concealed the true nature of their practices by marketing the Meta AI Glasses as privacy-protective devices and by representing that users remained in control of their recordings and personal data.

65.    These representations created the misleading impression that recordings captured by the Meta AI Glasses would remain private and under the user's control.

66.    In reality, the recordings were incorporated into Defendants' broader artificial intelligence data pipeline, which included review and annotation by third-party contractors.

67.    Plaintiffs and the putative Class Members first learned of Defendants' conduct only after investigative reporting and counsel's investigation revealed the existence of the human-review and AI-training pipeline associated with the Meta AI Glasses.

68.    The technical nature of Defendants' systems prevented the discovery of the full scope of Defendants' conduct. No disclosures or visible indicators alerted a reasonable consumer to interception or disclosure.

69.     Accordingly, the applicable statutes of limitations are tolled until the date on which Plaintiffs and the putative Class Members discovered, or reasonably could have discovered, Defendants' wrongful conduct.

## CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action individually and on behalf of the following Nationwide Class and Subclasses:

**Nationwide Class**: All persons in the United States who, during the relevant time period, purchased and/or used the Meta AI Glasses (the "Nationwide Class").

**California Subclass:** All members of the Nationwide Class who reside within the State of California (the "California Subclass").

**New York Subclass:** All members of the Nationwide Class who reside within the State of New York (the "New York Subclass").

**Illinois Subclass**: All members of the Nationwide Class who reside within the State of Illinois (the "Illinois Subclass").

71.     Specifically excluded from the Class and Subclasses are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

72.     Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveals that the Class and Subclasses should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

73.     This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

74.     <u>Numerosity (Rule 23(a)(1))</u>: The Class and Subclasses are believed to be so numerous that joinder of all members is impractical. Luxottica reported sales of over seven

million AI-enabled smart glasses in 2025 alone, with an estimated 3.2 million units sold in the United States.[16] Thus, the precise sizes of the Class and Subclasses are currently unknown but are readily ascertainable through Defendants' records.

75.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because they arise from the same course of conduct by Defendants and because Plaintiffs, like all members of the Class, used the Meta AI Glasses and had their communications intercepted, transmitted, stored, and disclosed to Sama.

76.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have no interests antagonistic to, nor in conflict with, the members of the Class and Subclasses. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

77.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

78.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and Subclasses that predominate over questions that may affect individual members include:

---

[16] Samantha Subin, *Ray-Ban maker EssilorLuxottica says it more than tripled Meta AI glasses sales in 2025*, CNBC (Updated Feb. 11, 2026 4:22 PM EST) https://www.cnbc.com/2026/02/11/ray-ban-maker-essilorluxottica-triples-sales-of-meta-ai-glasses.html (last accessed Mar. 10, 2026).

a.    Whether Defendants collected video, audio, and related personal information from Plaintiff and Nationwide Class Members through the Meta AI Glasses;

b.    Whether Defendants transmitted, stored, or otherwise processed recordings captured by the Meta AI Glasses on Meta's servers or associated data infrastructure;

c.    Whether Defendants disclosed or permitted access to recordings captured by the Meta AI Glasses to third-party contractors, including Sama or other data-annotation providers;

d.    Whether Defendants used recordings captured by the Meta AI Glasses to train, develop, or improve artificial intelligence systems;

e.    Whether Defendants failed to disclose material information regarding the capture, transmission, and review of recordings generated by the Meta AI Glasses;

f.    Whether Defendants' conduct constituted unlawful interception, disclosure, or use of electronic communications;

g.    Whether Defendants' representations regarding the privacy protections of the Meta AI Glasses were false, deceptive, or misleading;

h.    Whether Defendants' conduct constitutes a breach of a duty of care owed to Plaintiff and the Nationwide Class Members;

i.    Whether Plaintiff and the Nationwide Class Members provided informed consent for Defendants' collection and use of recordings captured by the Meta AI Glasses; and

j.    Whether Plaintiff and the Nationwide Class Members suffered injury or damages as a result of Defendants' conduct.

79.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

80.     The prosecution of separate actions by individual members of the Class and Subclasses would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

81.     Defendants have acted or refused to act on grounds generally applicable to the members of the Nationwide Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Nationwide Class as a whole.

82.     Given that Defendants' conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
**VIOLATIONS OF THE FEDERAL WIRETAP ACT and**
**ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

83.     Plaintiffs incorporate the allegations in paragraphs 1–82 by reference as if fully set forth herein.

84.     Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

85.     The federal Wiretap Act, as amended by the ECPA, codified at 18 U.S.C. § 2510, et seq. (the "Wiretap Act"), prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

86.     The ECPA further prohibits any person from intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(c).

87.     The ECPA further prohibits any person from intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(d).

88.     The ECPA provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

89.     The ECPA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

90.     The ECPA defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

91.     The ECPA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

92.     The ECPA defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

93.     Defendants are a "person[s]" within the meaning of the ECPA.

94.     Defendants intentionally intercepted Plaintiffs' and the Nationwide Class Members' wire, oral, and electronic communications by capturing audio and video data through the Meta AI Glasses and transmitting that data to its cloud servers and onward to Sama's annotation facilities in Kenya without adequate notice or consent. This interception occurs contemporaneously with the transmission of the communications through the device's recording and transmission systems, including the device microphones, onboard processors, companion application, and associated network infrastructure.

95.     Defendants intentionally disclosed the contents of Plaintiffs' and the Nationwide Class Members' intercepted communications by transmitting that footage to Sama, a third-party commercial subcontractor, for manual human review and annotation.

96.     Defendants intentionally used the contents of Plaintiffs' and the Nationwide Class Members' intercepted communications to train and refine Meta's AI models, enhance their product sales, and power their advertising platform(s).

97.     Plaintiffs had a reasonable expectation of privacy in their private communications and actions, particularly where Defendants marketed and sold the Meta AI Glasses as being privacy protective. Defendants violated Plaintiffs' and the Nationwide Class Members' reasonable expectations of privacy.

98.     At all relevant times, Defendants' conduct was knowing, willful, and intentional. Defendants are sophisticated commercial entities that knowingly marketed and sold the Meta AI Glasses to untold millions of persons while knowing and understanding that doing so would result in the interception and transmission of users' communications.

99.     Further, although the ECPA includes a one-party consent exception permitting interception where one party to the communication has consented, that exception does not apply when the communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State. *See* 18 U.S.C. § 2511(2)(d). This limitation is commonly referred to as the "crime–tort exception."

100.     Recent decisions in this District have held that the crime-tort exception applies where plaintiffs adequately allege facts supporting a claim for invasion of privacy, including disclosure of user information for, inter alia, advertising purposes and/or to increase profits.

101.     Defendants' conduct alleged herein falls within the crime–tort exception by committing enumerated statutory and tortious violations. Defendants invaded Plaintiffs' and the Nationwide Class Members' privacy by intercepting their private communications including audio, video, and text transmitted from the Meta AI Glasses to its servers and subsequently routed to Sama for the purpose of committing the tort of intrusion upon seclusion as Defendants

intercepted, stored, reviewed, and transmitted highly sensitive audio and visual footage, which includes depicting nudity, sexual activity, bathroom use, and financial information, to overseas contractors for viewing and annotation without adequate notice or consent. Such conduct constitutes an intentional intrusion into the private affairs of Plaintiffs and the Nationwide Class Members that would be highly offensive to a reasonable person.

102.    Because Defendants' conduct was and is undertaken for the purpose of facilitating tortious acts, the one-party consent exception does not apply, and Defendants are subject to liability under the ECPA.

103.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and the Nationwide Class Members are entitled to: (a) preliminary, equitable, and declaratory relief; (b) damages, including actual damages and any profits made by Defendants as a result of their violations, or statutory damages of the greater of $100 per day for each day of violation or $10,000, whichever is greater; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

<u>**COUNT II**</u>
**COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Class)**

104.    Plaintiffs incorporate the allegations in paragraphs 1–82 by reference as if fully set forth herein.

105.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

106.    Defendants have intruded upon the legally protected privacy interests of Plaintiffs and the Nationwide Class by, among other things, surreptitiously intercepting, recording, and transmitting their private communications and behavior without consent.

107.    Plaintiffs and the Nationwide Class Members maintained a reasonable expectation of privacy in their intimate communications, interactions, and behaviors.

108.    Plaintiffs and the Nationwide Class Members relied on Defendants' misrepresentations that the Meta AI Glasses ensured users' control over their privacy; however,

Defendants surreptitiously recorded, stored, and transmitted Plaintiffs' and the Nationwide Class Members' private communications, interactions, and behaviors.

109.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Nationwide Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, and other compensable harms.

110.    Plaintiffs and the Nationwide Class Members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available, and injunctive relief to prevent further harm.

<u>COUNT III</u>
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, et seq.**
**(On Behalf of Plaintiff Beltran and the California Subclass)**

111.    Plaintiff Beltran incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

112.    California Business & Professions Code, sections 17200, et seq. (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

113.    Defendants, in their pervasive advertising and marketing of the Meta AI Glasses, made misleading statements regarding the quality and characteristics of the Meta AI Glasses, specifically, regarding the data safety and privacy of consumers of Meta AI Glasses. Instead, Meta transmits consumer data, including sensitive videos captured with Meta AI Glasses, for human "data annotators" to view and annotate, so that Meta can use the videos to train Defendants' own AI model.

114.    Defendants do not have any reasonable basis for the misrepresentations and/or omissions made in Defendants' advertising because Defendants did not maintain consumers' data privacy. Thus, the Meta AI Glasses fail to deliver the advertised functionality for everyday use and during various activities, as directed and intended by Defendants. Defendants knew, and

know, that they do not maintain the privacy of consumer data captured by the Meta AI Glasses, thereby misrepresenting their functionality, and yet Defendants intentionally advertised and marketed the Meta AI Glasses to deceive reasonable consumers and continue to do so presently.

115.    Defendants' advertising and marketing of the Meta AI Glasses led to, and continue to lead to, reasonable consumers, including Plaintiff Beltran and the California Subclass Members, believing that they will be able to maintain the privacy and control of their data while using the Meta AI Glasses as Defendants advertised.

116.    Plaintiff Beltran and the California Subclass Members have suffered injury in fact and have lost money or property as a result of and in reliance upon the Defendants' misrepresentations and omissions, namely, Plaintiff Beltran and the California Subclass Members lost the purchase price for the Meta AI Glasses they bought from the Defendants.

117.    Defendants' conduct, as alleged herein, constitutes unfair and unlawful business practices pursuant to the UCL, which broadly prohibits unfair competition and provides in pertinent part that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200.

118.    Additionally, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

119.    Defendants failed to avail themselves of reasonably available, lawful alternatives to further their legitimate business interests.

120.    All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern, practice, and/or generalized course

of conduct, which will continue on a daily basis until Defendants voluntarily alter their conduct or Defendants are otherwise ordered to do so.

121.    Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiff Beltran and the California Subclass Members seek an order from this Court enjoining Defendants from continuing to engage, use, or employ their practice of false and deceptive advertising and marketing of the Meta AI Glasses. Likewise, Plaintiff Beltran and the California Subclass Members seek an order requiring Defendants to disclose such misrepresentations, and to preclude Defendants' failure to disclose the existence and significance of said misrepresentations.

122.    As a direct and proximate result of Defendants' misconduct in violation of the UCL, Plaintiff Beltran and the California Subclass Members were harmed in the amount of the purchase price they paid for the Meta AI Glasses.

123.    Further, Plaintiff Beltran and the California Subclass Members have suffered and continue to suffer economic losses and other damages, including, but not limited to, the amounts paid for the Meta AI Glasses, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff Beltran and the California Subclass Members seek a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff Beltran and the California Subclass Members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

## <u>COUNT IV</u>
### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
#### Cal. Bus. & Prof. Code § 17500, et seq.
#### (On Behalf of Plaintiff Beltran and the California Subclass)

124.    Plaintiff Beltran incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

125.    Plaintiff Beltran brings this claim individually and on behalf of the California Subclass Members.

126.    The False Advertising Law, codified at Cal. Bus. & Prof. Code § 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising."

127.    Defendants violated Cal. Bus. & Prof. Code § 17500 when they advertised and marketed the Meta AI Glasses through the unfair, deceptive, and misleading representations and omissions disseminated to the public through the Defendants' advertising and marketing.

128.    Defendants' representations were deceptive because the Meta AI Glasses do not conform to them. The representations were material because they are likely to mislead a reasonable consumer into purchasing the Meta AI Glasses.

129.    In making and disseminating the material misrepresentations and omissions alleged herein, Defendants knew or should have known that the representations were untrue or misleading, and acted in violation of Cal. Bus. & Prof. Code section 17500.

130.    Defendants' complained-of conduct was and is specifically designed to induce reasonable consumers, like Plaintiff Beltran and the California Subclass Members, to purchase the Meta AI Glasses.

131.    As a direct and proximate result of Defendants' conduct in violation of the False Advertising Law, Plaintiff Beltran and the California Class Members were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff Beltran and the California Subclass Members have suffered and continue to suffer economic losses and other damages, including, but not limited to, the amounts paid for the Meta AI Glasses, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff Beltran and the California Subclass Members seek a monetary award for violation of the False Advertising Law in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff Beltran and the California Subclass Members for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result, as well as a corrective advertising campaign to correct prior misrepresentations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT V
### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
Cal. Civ. Code § 1750, et seq.
(On Behalf of Plaintiff Beltran and the California Subclass)

132.     Plaintiff Beltran incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

133.     Plaintiff Beltran brings this claim individually and on behalf of the California Subclass Members.

134.     The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

135.     The Meta AI Glasses are "goods," as defined by Cal. Civ. Code § 1761(a) because they are tangible objects that Plaintiff Beltran and the California Subclass purchased primarily for personal, family, or household purposes.

136.     Defendants are "persons," within the meaning of Cal. Civ. Code § 1761(c).

137.     Plaintiff Beltran and the California Subclass Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d) because they are individuals who purchased the Meta AI Glasses for personal, family, or household purposes.

138.     The purchases of the Meta AI Glasses by Plaintiff Beltran and the California Subclass Members are "transactions" within the meaning of Cal. Civ. Code § 1761(e) because Plaintiff Beltran and the California Subclass Members entered into agreements with Defendants or their authorized vendors to purchase the Meta AI Glasses.

139.     Therefore, Defendants' conduct violated, *inter alia*, Cal. Civ. Code § 1770(a)(5) (by representing that the Meta AI Glasses have "characteristics. . . . uses [or] benefits . . . which they do not have."), Cal. Civ. Code § 1770(a)(7) (by representing that the Meta AI Glasses "are of a particular standard, quality, or grade . . . when they are of another."), and Cal. Civ. Code § 1770(a)(9) (by advertising the Meta AI Glasses "with [the] intent not to sell [] as advertised.").

140.    Defendants' uniform and material representations and omissions regarding the Meta AI Glasses were likely to deceive Plaintiff Beltran and the California Subclass Members, and Defendants knew or should have known that their misrepresentations and omissions were materially misleading.

141.    Defendants' conduct was and is malicious and wanton in that Defendants intentionally misled and withheld material information from consumers, including Plaintiff Beltran and the California Subclass Members, to increase the sale of the Meta AI Glasses.

142.    Plaintiff Beltran and the California Subclass Members could not have reasonably avoided such injury. Plaintiff Beltran and the California Subclass Members were unaware of the facts Defendants suppressed and failed to disclose, and Plaintiff Beltran and the California Subclass Members would not have purchased the Meta AI Glasses or would have purchased them on different terms had they known the truth.

143.    Plaintiff Beltran and the California Subclass Members suffered harm as a result of Defendants' violations of the CLRA because they relied on Defendants' material misrepresentations and omissions in deciding to purchase the Meta AI Glasses. Indeed, Defendants' material misrepresentations and omissions were a substantial factor informing Plaintiff Beltran's and the California Subclass Members' purchases of the Meta AI Glasses because a reasonable consumer would consider said misrepresentations/omissions important in deciding whether to purchase the Meta AI Glasses.

144.    As a direct and proximate result of Defendants' misconduct in violation of the CLRA, Plaintiff Beltran and the California Subclass Members were harmed in the amount of the purchase price they paid for the Meta AI Glasses. Accordingly, Plaintiff Beltran and the California Subclass Members seek a monetary award for violation of this Act in the form of restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff Beltran and the California Subclass Members for said monies.

145.    Further, pursuant to Cal. Civ. Code § 1780(a), Plaintiff Beltran and the California Subclass Members seek injunctive relief in the form of an order enjoining the above-described

wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from continuing to make the misleading claims and omissions challenged herein and requiring Defendants to undertake a corrective advertising campaign to correct their prior false and misleading representations. Plaintiff Beltran and the California Subclass Members also request a court order requiring Defendants to provide restitution to Plaintiff Beltran and the California Subclass Members for the money wrongfully acquired. Unless this injunctive relief is granted, Plaintiff Beltran and the California Subclass Members will suffer irreparable harm.

146. Plaintiff Beltran and the California Subclass Members respectfully request that the Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2). In addition, Defendants should be compelled to provide restitution to consumers who paid for the Meta AI Glasses that are not what they expected to receive due to Defendants' misrepresentations.

147. Plaintiff Beltran and the California Subclass Members are entitled to equitable relief as no adequate remedy at law exists.

148. Injunctive relief is appropriate on behalf of Plaintiff Beltran and the California Subclass Members because Defendants have failed to make clear in their advertising and conduct that consumers cannot maintain privacy or control over their personal data while using the Meta AI Glasses. Injunctive relief is necessary to correct past harm and prevent future harm, neither of which can be achieved through available legal remedies. Further, injunctive relief, in the form of advertising or marketing modifications as well as a corrective advertising campaign, is necessary to dispel public misperception about the Meta AI Glasses that has resulted from Defendants' unfair and unlawful marketing efforts. Such modifications would include disclosure of the data-collection practices described above, or making clear to consumers that they will not be able to maintain privacy and control over their personal data. Such relief is also not available through a legal remedy, as monetary damages may be awarded to remedy past harm (i.e., purchasers who have been misled), while injunctive relief is necessary to remedy future harm (i.e., prevent future purchasers from being misled), under the current circumstances where the dollar amount of future

damages is not reasonably ascertainable at this time. Plaintiff Beltran and the California Subclass Members are currently unable to accurately quantify the damages caused by Defendants' future harm (e.g., the dollar amount that Plaintiff Beltran and the California Subclass Members overpaid for the Meta AI Glasses), rendering injunctive relief a necessary remedy.

## COUNT VI
## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
## Cal. Penal Code § 631
## (On Behalf of Plaintiff Beltran and the California Subclass)

149.    Plaintiff Beltran incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

150.    Plaintiff Beltran brings this cause of action on behalf of himself and the California Subclass.

151.    The California Invasion of Privacy Act ("CIPA") provides that a defendant is liable where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

152.    Defendants' Meta AI Glasses and associated network infrastructure are a "machine, instrument, contrivance, or... other manner" used to engage in the prohibited conduct at issue here.

153.    Without the consent of all parties, Defendants willfully read or attempted to read or learn the contents or meaning of Plaintiffs' and the California Subclass Members' electronic communications of Plaintiffs and the California Subclass Members, within California. This interception occurs contemporaneously with the transmission of the communications through the device's recording and transmission systems, including the device microphones, onboard processors, companion application, and associated network infrastructure. On information and belief, Meta uses servers located in California that allow Defendants to access private communications of Plaintiff and Class Members.

154.    In direct violation of CIPA and without the consent of Plaintiff Beltran or California Subclass Members, Defendants have been using AI technology to contemporaneously eavesdrop and record the confidential videos of Plaintiff and Class Members on Meta AI Glasses.

155.    Defendants have used this information, so unlawfully obtained, to train Meta's AI Models and for other business purposes.

156.    Within the relevant time period, Defendants aided, agreed with, and conspired with each other to accomplish the wrongful conduct alleged herein.

157.    As a result of Defendants' violations of CIPA, Plaintiff Beltran and the California Subclass are entitled to declaratory relief, statutory damages, trebled actual damages, an award of attorney's fees and costs, and other equitable relief the Court deems appropriate.

**COUNT VII**
**VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS**
**AND PRACTICES ACT N.Y.**
**Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Perez and the New York Subclass)**

158.    Plaintiff Perez incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

159.    N.Y. Gen. Bus. ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state..."

160.    Defendants conduct consumer-oriented business and trade in New York, including in their advertising and sale of the Meta AI Glasses throughout the country, as required by GBL § 349.

161.    Defendants violated GBL § 349 by deceptively representing that the Meta AI Glasses were designed to protect users' privacy and that users maintained control over their data and recordings.

162.    Defendants' marketing materials and public representations conveyed to consumers that the Meta AI Glasses were privacy-protective devices and that recordings captured by the Meta AI Glasses remained under the user's control.

163.    Defendants' representations were materially misleading because Defendants failed to disclose that recordings and other data captured through the Meta AI Glasses could be transmitted to Defendants' systems and used for artificial intelligence development and related purposes.

164.    Defendants' omissions and misrepresentations created the false impression that users maintained meaningful control over the recordings captured by the Meta AI Glasses and that such recordings would remain private.

165.    Defendants' deceptive conduct was directed at users, including Plaintiff Perez and the New York Subclass Members, and occurred repeatedly in the course of Defendants' marketing and sale of the Meta AI Glasses.

166.    The information Defendants failed to disclose was material because reasonable consumers would have considered it important in deciding whether to purchase or use the Meta AI Glasses.

167.    Had Plaintiff Perez and members of the New York Subclass known that recordings captured through the Meta AI Glasses could be transmitted, stored, or used by Defendants in ways not disclosed to consumers, they would not have purchased the device or would have paid substantially less for it.

168.    Defendants alone possessed the information that was material to Plaintiff Perez and the New York Subclass Members and failed to disclose said material information to consumers.

169.    Therefore, Defendants have engaged in, and continue to engage in, deceptive conduct in violation of GBL section 349.

170.    Defendants' unlawful conduct described herein caused Plaintiff Perez and the New York Subclass Members to suffer injury in the form of actual damages, including the loss of control over their data and information.

171.    Defendants intended for Plaintiff Perez and the New York Subclass Members to rely on their misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, regarding the nature and extent of its data-collection and tracking practices.

172.    GBL § 349 applies to Plaintiff Perez and the New York Subclass Members because the State of New York has an interest in regulating business conduct in the region. Defendants regularly conduct business, including the marketing and sale of the Meta AI Glasses, within the State of New York.

173.    Defendants' conduct has caused, and is causing, immediate and irreparable injury to Plaintiff Perez and the New York Subclass Members. Defendants' conduct will continue to damage Plaintiff Perez and the New York Subclass Members and deceive the public unless enjoined by this Court.

174.    As a direct and proximate result of Defendants' violations, Plaintiff Perez, the New York Subclass Members, and other reasonable consumers have been harmed, and that harm will continue unless Defendants are enjoined from continuing to misrepresent and omit the true nature of their data-collection, tracking, and information-sharing practices.

**COUNT VIII**
**VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Perez and the New York Subclass)**

175.    Plaintiff Perez incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

176.    N.Y. Gen. Bus. ("GBL") § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

177.    Pursuant to GBL § 350-a, false advertising is defined as "advertising, including labelling, of a commodity . . . if such advertising is misleading in a material respect . . . [where "misleading" refers to] representations made by statement, word, design, . . . or any combination thereof, but also to the extent to which to which the advertising fails to reveal facts material in the light of such representations . . . ."

178.    Defendants engaged in false advertising by promoting the Meta AI Glasses as privacy-protective devices and by representing that the Meta AI Glasses were designed to safeguard users' privacy and place users in control of their data.

179.    Defendants purposely misrepresented, actively concealed, and failed to disclose material facts regarding their data-collection, tracking, and information-sharing practices to consumers, including Plaintiff Perez and the New York Subclass Members.

180.    The facts misrepresented, concealed, or otherwise undisclosed by Defendants were material in that Plaintiff Perez, the New York Subclass Members, and other reasonable consumers would have considered them when deciding whether to purchase the Defendants' Meta AI Glasses. Had Plaintiff Perez and the New York Subclass Members known that Defendants continued to collect and disclose their data, they would not have purchased the Meta AI Glasses or paid significantly less for them.

181.    Defendants obtained a benefit from Plaintiff Perez and the New York Subclass Members by collecting, using, and disclosing their private data through the Meta AI Glasses, while depriving them of the ability to control the use and sharing of that data, despite the

1  availability of reasonable alternatives that do not engage in the same deceptive data-collection
2  practices.

3      182.    Defendants' conduct caused Plaintiff Perez and the New York Subclass Members
4  to suffer actual damages by depriving them of the ability to make informed choices about the
5  collection and disclosure of their personal information and by subjecting them to unauthorized
6  tracking and data sharing, which they would have avoided had Defendants accurately disclosed
7  their data-collection practices.

8      183.    As a direct and proximate result of Defendants' violation of New York General
9  Business Law § 350, Plaintiff Perez and the New York Subclass Members have been injured, and
10 that harm will continue unless Defendants are enjoined from continuing to misrepresent and omit
11 the true nature of their data-collection, tracking, and information-sharing practices on the
12 Website.

13     184.    Defendants' conduct has also substantially injured the public, as consumers across
14 the country were exposed to and relied upon Defendants' representations regarding their data-
15 privacy practices while unaware of material omissions, specifically, the failure to disclose that
16 users' personal information was collected, shared, and disclosed to third parties.

17     185.    Defendants' omissions deprived consumers of the ability to make informed
18 decisions about their privacy and created a false impression that users' choices in utilizing the
19 Meta AI Glasses meaningfully controlled data collection and sharing, thereby undermining public
20 trust in websites that purport to offer transparency.

21     186.    Defendants' conduct thus caused real-world harm and poses an ongoing risk of
22 further injury if not enjoined.

23     187.    Pursuant to GBL section 350-e, Plaintiff Perez and the New York Subclass
24 Members seek injunctive relief, declaratory relief, actual and punitive damages, or $500
25 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and
26 attorneys' fees.

27
28

CLASS ACTION COMPLAINT

**COUNT IX**
**VIOLATIONS OF THE ILLINOIS EAVESDROPPING ACT**
**720 ILCS 5/14-1, et seq.**
**(On Behalf of Plaintiff Moore and the Illinois Subclass)**

188.    Plaintiff Moore incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

189.    The Illinois Eavesdropping Act prohibits a person from knowingly and intentionally using an eavesdropping device to hear or record all or part of any private conversation unless the person does so with the consent of all parties to the conversation. 720 ILCS 5/14-2.

190.    The statute defines an "eavesdropping device" as any device capable of being used to hear or record oral conversations. 720 ILCS 5/14-1.

191.    Defendants designed, manufactured, marketed, and distributed the Meta AI Glasses at issue in this action.

192.    The Meta AI Glasses include microphones, camera(s), and other technologies capable of capturing spoken communications near the wearer.

193.    Defendants intentionally designed the Meta AI Glasses and their associated software systems to capture spoken communications through these microphones when the device is activated.

194.    When activated, the Meta AI Glasses record audio conversations occurring in the surrounding environment.

195.    The Meta AI Glasses do not merely record audio locally. The device transmits captured audio to Defendants' servers and related systems for storage, processing, and analysis.

196.    Defendants designed these systems so that captured recordings are processed by automated systems, and human review processes are used to operate and improve artificial-intelligence technologies.

197.    The recordings captured by the Meta AI Glasses include conversations between individuals who are not users of the device.

38
CLASS ACTION COMPLAINT

198.    These individuals are often unaware that their communications are being recorded or transmitted.

199.    The conversations occur in circumstances where participants reasonably expect their communications to be private, including in homes, workplaces, and other non-public environments. These conversations occur under circumstances in which participants reasonably expect that their communications are not being recorded by an electronic device.

200.    The individuals whose communications are captured do not consent to the recording or transmission of their conversations.

201.    Those individuals have no ability to control the device's operation or to prevent the recording or transmission of their communications.

202.    Plaintiff Moore and members of the Illinois Subclass were located in Illinois when their conversations were recorded and transmitted.

203.    The conversations at issue occurred in Illinois and involved individuals there.

204.    By knowingly and intentionally using a device capable of hearing or recording oral conversations to record private conversations without the consent of all parties, Defendants used an eavesdropping device in violation of the Illinois Eavesdropping Act.

205.    As a direct and proximate result of Defendants' conduct, Plaintiff Moore and members of the Illinois Subclass had their private conversations recorded and transmitted without consent.

206.    Plaintiff Moore and the Illinois Subclass seek all relief available under Illinois law, including damages, injunctive relief, and any other relief the Court deems appropriate.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>COUNT X</u>
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
815 ILCS 505/1, et seq.
(On Behalf of Plaintiff Moore and the Illinois Subclass)**

207.    Plaintiff Moore incorporates the allegations in paragraphs 1–82 by reference as if fully set forth herein.

208.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, prohibits unfair or deceptive acts or practices, including the concealment, suppression, or omission of material facts, in the conduct of trade or commerce.

209.    Defendants design, manufacture, market, advertise, and sell the Meta AI Glasses at issue in this action in the course of their trade or commerce.

210.    In marketing the Meta AI Glasses, Defendants represent that the device incorporates privacy protections and that users have control over recording and data collection. (*See* ¶¶ 9-11, which include descriptions of Defendants' privacy-related marketing statements.)

211.    The Meta AI Glasses contain microphones and cameras that capture audio and video from the surrounding environment.

212.    When activated, the Meta AI Glasses record audio conversations occurring near the wearer.

213.    The Meta AI Glasses transmit captured audio and video to Defendants' servers and related systems for storage, processing, and analysis. (*See* ¶¶ 20-56 describing the process by which Defendants record and transmit user data and private information and recordings).

214.    These recordings include conversations and other information relating to individuals who are not users of the device.

215.    Defendants do not disclose, or do not adequately disclose, these practices to consumers at the time of purchase.

216.    Defendants therefore conceal, suppress, or omit material facts concerning how the Meta AI Glasses capture, transmit, and process audio and video recordings.

217.    Defendants possess and control information regarding these practices that is not available to consumers.

218.    Defendants know that consumers purchasing the Meta AI Glasses would not expect conversations occurring near the device to be captured and transmitted to Defendants' systems.

219.    Defendants intend that consumers rely on their representations and omissions when deciding whether to purchase the Meta AI Glasses.

220.    Defendants' privacy-related representations and omissions are material to consumers' decisions about whether to purchase the Meta AI Glasses.

221.    Plaintiff Moore and members of the Illinois Subclass purchased the Meta AI Glasses in Illinois during the Class Period. (*See* ¶ 11 describing Plaintiff Moore's purchases in Illinois).

222.    Plaintiff Moore and the members of the Illinois Subclass relied on Defendants' representations and omissions when purchasing the Meta AI Glasses.

223.    As a direct and proximate result of Defendants' conduct, Plaintiff Moore and the members of the Illinois Subclass suffer economic injury, including paying money for products that are worth less than represented.

224.    Defendants' conduct constitutes unfair or deceptive acts or practices in violation of ICFA, 815 ILCS 505/2.

225.    Plaintiff Moore and the Illinois Subclass seek all relief available under ICFA, including damages, injunctive relief, and any other relief the Court deems appropriate.

## COUNT XI
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

226.    Plaintiffs incorporate the allegations in paragraphs 1–82 by reference as if fully set forth herein.

227.    Plaintiffs bring this cause of action on behalf of themselves and all Nationwide Class Members.

228.     Defendants obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and Nationwide Class Members' Sensitive Information, which Defendants then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

229.     Defendants retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendants' representations to users. Defendants' retention of those benefits is unjust.

230.     Plaintiffs and the Nationwide Class Members conferred these benefits on Defendants, and Defendants have been unjustly enriched at the expense of Plaintiffs and the Nationwide Class Members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendants. Therefore, Plaintiffs and Nationwide Class Members are entitled to the relief set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendants, as follows:

      a.     For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and Subclasses and their counsel as Class Counsel;

      b.     For an order declaring the Defendants' conduct violated the statutes referenced herein;

      c.     For an order finding in favor of Plaintiffs and the Nationwide Class and Subclasses on all counts asserted herein;

      d.     Entry of an order for injunctive and declaratory relief as described herein;

      e.     Disgorgement of all data and video footage Meta obtained and disclosed through its unlawful conduct, all associated data created from obtaining and disclosing Plaintiffs' and Class Members' private communications, all

1    algorithms trained on this ill-gotten data, and disgorgement of all profits

2    and revenues obtained through its unlawful conduct;

3         f.     An award of statutory damages or penalties to the extent available;

4         g.     For damages in amounts to be determined by the Court and/or jury;

5         h.     For pre-judgment interest on all amounts awarded;

6         i.     For an order of restitution and all other forms of monetary relief;

7         j.     An award of all reasonable attorneys' fees and costs; and

8         k.     Such other and further relief as the Court deems necessary and appropriate.

9    **<u>DEMAND FOR TRIAL BY JURY</u>**

10    Plaintiffs demand a trial by jury of all issues so triable.

11    Dated: March 16, 2026              By: */s/Thomas E. Loeser*

12                              Joseph W. Cotchett (SBN 36324)
Thomas E. Loeser (SBN 202724)

13                              Gia Jung (SBN 340160)
**COTCHETT PITRE & McCARTHY, LLP**

14                              840 Malcolm Road
Burlingame, CA 94010

15                              T: (650) 687-6000
F: (650) 697-0577

16                              jcotchett@cpmlegal.com

17                              tloeser@cpmlegal.com
gjung@cpmlegal.com

18

19                              Karin B. Swope*
Jacob M. Alhadeff*

20                              **COTCHETT, PITRE & McCARTHY, LLP**

21                              1809 7th Avenue, Suite 1610
Seattle, WA 98101

22                              T: (206) 802-1272
F: (206)-299-4184

23                              kswope@cpmlegal.com
jalhadeff@cpmlegal.com

24

25

26

27

28

43
**CLASS ACTION COMPLAINT**

Eduard Korsinsky*
Mauk Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
T: (212) 363-7500
F: (212) 363-7171
ek@zlk.com
mjensen@zlk.com

*Counsel for Plaintiffs*

**pro hac vice** forthcoming